In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3055

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND and
ARTHUR H. BUNTE, JR., Trustee,

*Plaintiffs-Appellees*,

*v.*

CHARLES F. NAGY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CV 358—**Marvin E. Aspen**, *Judge.*

ARGUED APRIL 2, 2012—DECIDED APRIL 22, 2013

Before ROVNER, SYKES, and TINDER, *Circuit Judges.*

SYKES, *Circuit Judge.* Central States, Southeast and
Southwest Areas Pension Fund ("Central States" or "the
Fund") is a multiemployer pension plan for members
of the Teamsters union in the eastern half of the United
States. Nagy Ready Mix employed Teamsters labor and
participated in the Central States plan. In 2007 Ready

Mix ceased employing covered workers and thus incurred $3.6 million in "withdrawal liability" owed to Central States and assessed against it to fully fund its pension obligations.

Ready Mix was unable to pay the full $3.6 million assessment. This case asks whether Charles F. Nagy, its owner, and two affiliated companies under his common control are liable for the shortfall under the Employee Retirement Income Security Act ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1301(b)(1). The related Nagy-owned companies conceded liability in the district court, so the only question on appeal concerns Nagy's personal liability. The answer turns on whether he engaged in an unincorporated "trade or business" under common control with Ready Mix. If so, he is personally liable for the payments.

The Fund identified two possibilities. First, Nagy owns the property on which Ready Mix conducts its operations and leases the property back to his company. The Fund contends that this rental activity qualifies as a trade or business under § 1301(b)(1). Second, Nagy provided management services to a country-club venture. The Fund claims that he did so as an independent contractor, which likewise would qualify as a trade or business under § 1301(b)(1).

On cross-motions for summary judgment, the district court concluded that Nagy held and leased the property to Ready Mix as a passive investment, not a trade or business, so the leasing activity did not trigger personal

liability under § 1301(b)(1). But the court also held that Nagy worked for the country club as an independent contractor, not an employee, and this activity qualified as a trade or business under § 1301(b)(1). That alone was enough for personal liability, so the court entered judgment for the Fund. Nagy appealed.

We affirm, though on a somewhat different analysis. Recent decisions of this court confirm that Nagy's leasing activity is categorically a trade or business for purposes of personal liability under § 1301(b)(1). *See Cent. States, Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d 874, 881 (7th Cir. 2013); *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 879 (7th Cir. 2011). Although the district court did not have the benefit of these decisions, it is now clear that it was a mistake to conclude that Nagy's leasing of property to Ready Mix did not qualify as a trade or business. But this just means there are two grounds for personal liability, not one. The district court correctly held that Nagy provided management services to the country club as an independent contractor, which also qualifies as a trade or business under § 1301(b)(1).

## I. Background

Charles F. Nagy operates several small businesses. Among them is Nagy Ready Mix, Inc., a concrete company based in Utica, Michigan. For several years Ready Mix employed Teamsters labor and made payments to the Central States Fund, the Teamsters' pension

plan, under the terms of a collective-bargaining agreement. In June 2007 Ready Mix stopped using Teamsters labor and ended its participation in the Fund. This action constituted a "complete withdrawal" from the plan, *see* 29 U.S.C. § 1383, and to fully fund the company's outstanding obligations, Central States assessed Ready Mix a "withdrawal liability" in the principal amount of $3,656,058.59. In May 2008 Ready Mix initiated arbitration to challenge that calculation.

While arbitration was pending, Ready Mix was obligated under 29 U.S.C. § 1401(d) to make payments on the assessment. The company failed to do so, and the Fund initiated this lawsuit against Nagy and two related companies seeking to hold them jointly and severally liable for the assessment. Before the district court, the parties agreed that two other Nagy-owned enterprises—Nagy Trucking and Nagy Concrete Company—were under common control with Ready Mix and therefore were jointly and severally liable for the assessment. The parties disagreed, however, over whether Nagy was personally liable.

The Fund suggested two possible grounds for Nagy's personal liability. First, the Fund argued that Nagy's property-leasing activities constituted an unincorporated "trade or business" under § 1301(b)(1). This statutory definition treats all commonly controlled "trades or businesses," incorporated and unincorporated alike, as a single employer for purposes of withdrawal liability. The facts of Nagy's rental activity were undisputed. In 1972 Ready Mix purchased property at

480100 Hixson Avenue in Utica, Michigan, to serve as its base of operations. In 1986 the company sold the property to Nagy, who conveyed it to a revocable trust. Nagy then leased the property back to Ready Mix pursuant to a triple-net lease that made Ready Mix responsible for utilities, insurance, and tax payments, as well as maintenance and repair. Thus, though owned by Nagy individually, the property remained the primary facility for both Ready Mix and Nagy Trucking.

The second possible ground for personal liability focused on Nagy's management work for a country club located in the City of Washington, Michigan. The club, consisting of a golf course and a restaurant, was owned by the Wells Venture Corporation, of which Nagy was a shareholder, director, and president. From the early 1990s through 2005, Nagy oversaw operations at the golf course and in that capacity handled the bookkeeping and management. In 2005 the club's board of directors decided to sell the golf course. Nagy took the lead in accomplishing this task, and for the first time the board began compensating him to reflect his new responsibilities. He was paid $150 per hour. After selling the golf course, Nagy continued to manage the club's remaining assets, working from his home. Wells Venture paid him as an independent contractor, without payroll deductions, as reflected on 1099-MISC forms for tax years 2005, 2006, 2007, and 2008. Nagy reported this income, which exceeded $200,000 in total, on Schedule C of his tax returns, which covers sole proprietors. Wells Venture repossessed the golf course in January 2010 after the purchaser defaulted.

On cross-motions for summary judgment, the district court rejected the first ground for Nagy's personal liability but accepted the second. In the court's view, Nagy's leasing activity was a passive investment, not a trade or business within the meaning of § 1301(b)(1). Regarding Nagy's work for the country club, however, the court held that Nagy provided managerial services as an independent contractor, which qualified as a trade or business under § 1301(b)(1). Because Nagy's independent-contractor work for the club was enough to support personal liability, the court granted summary judgment for the Fund and against Nagy, and also entered summary judgment for the Fund holding Nagy Trucking and Nagy Concrete jointly and severally liable for the assessment. This appeal followed.

## II. Discussion

The MPPAA protects multiemployer pension plans and their beneficiaries by preventing withdrawing employers from ducking their pension obligations. *See Messina Prods.*, 706 F.3d at 878; *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1374 (7th Cir. 1992). The withdrawal-liability provisions at issue in this case were enacted "to ensure that when an employer withdraws from a pension plan, the financial burden of its employees' vested pension benefits would not be borne by the other employers in the plan." *Cent. States, Se. & Sw. Areas Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 791 (7th Cir. 1992). In current parlance we might say that the MPPAA has a

"no bailouts" clause—a withdrawing employer cannot shift its obligations onto the other companies in the plan or ultimately onto the taxpayers via the Pension Benefit Guarantee Corporation. *See Messina Prods.*, 706 F.3d at 878.

To ensure that assets are available to cover a withdrawing employer's liability, Congress provided that all trades or businesses under common control with the withdrawing employer are treated as a single employer for purposes of joint and several liability:

> An individual who owns the entire interest in an unincorporated trade or business is treated as his own employer . . . . For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades or businesses as a single employer.

29 U.S.C. § 1301(b)(1). The purpose of § 1301(b)(1) "is to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities." *Messina Prods.*, 706 F.3d at 878 (internal quotation marks omitted). "Common control" is defined by the relevant regulations as 80% shared ownership. 26 C.F.R. § 1.414(c)-2(b)(2).

The parties agree that the two other Nagy-owned companies—Nagy Trucking and Nagy Concrete—are under common control with Ready Mix, and thus both are liable for the $3.6 million that Ready Mix owes the

Fund. The contested issue is whether Nagy himself can be held personally liable. An individual is personally liable when he holds the entire interest in an unincorporated "trade or business" under common control with the withdrawing employer. 29 U.S.C. § 1301(b)(1); *Messina Prods.*, 706 F.3d at 878; *Cent. States, Se & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 893-94 (7th Cir. 2001). Under the circumstances here, the common control is obvious; the key question is whether Nagy engaged in an unincorporated "trade or business" within the meaning of § 1301(b)(1). The answer depends on whether his leasing arrangement with Ready Mix or his management services to the country club, or both, qualify as an unincorporated trade or business within the meaning of § 1301(b)(1).

These are questions we would ordinarily review de novo on an appeal from a summary judgment. *SCOFBP*, 668 F.3d at 877. However, where, as here, there is no right to a jury trial and "the only issue before the district court is the characterization of undisputed subsidiary facts," we have held that the clear-error standard of review applies. *Messina Prods.*, 706 F.3d at 879; *see also SCOFBP*, 668 F.3d at 877. Put differently, in these sorts of ERISA cases, we review "mixed questions of law and fact" under a clearly erroneous standard. *Fulkerson*, 238 F.3d at 894.[1]

---

[1] Because it alters normal summary-judgment review, our approach to the standard of review has sometimes been resisted.

(continued...)

The evaluation of Nagy's work for the country club is such a mixed question. We are asked to review whether the district court properly characterized the undisputed facts as establishing Nagy's status as an independent contractor. The leasing issue is different, however. The parties dispute whether a categorical rule governs leasing of property to a commonly controlled company. This is a question of law under our precedents, so our review is de novo. *See Messina Prods.*, 706 F.3d at 879. We follow the district court's order of battle and take up the leasing question first.

---

[1] (...continued)

*See, e.g.*, *Jurcev v. Central Cmty. Hosp.*, 7 F.3d 618, 623 (7th Cir. 1993) ("[T]his new standard causes us some concern."). The framework first appeared in *Central States, Southeast & Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373 (7th Cir. 1992) (citing *United States v. McKinney*, 919 F.2d 405, 419 (7th Cir. 1991) (Posner, J., concurring)). *See Cent. States, Se. & Sw. Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 792 (7th Cir. 1992). On several occasions we have been asked to revisit and overrule *Slotky* on the standard-of-review issue, but each time we have declined to do so in the specific circumstances of the case. *See Cent. States, Se. & Sw. Areas Pension Fund v. Neiman*, 285 F.3d 587, 593 (7th Cir. 2002); *Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 640 (7th Cir. 2001); *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 894 (7th Cir. 2001). We have noted, however, that the D.C. Circuit has adopted standard summary-judgment review for these cases. *Neiman*, 285 F.3d at 594 n.4 (citing *Connors v. Incoal, Inc.*, 995 F.2d 245, 251 n.9 (D.C. Cir. 1993)). The parties have not asked us to revise our approach to the standard of review, nor would a different standard affect our decision.

### A.  Leasing Activity

The Fund argues that because Nagy owned and leased to Ready Mix the property on which it conducted its business operations, he essentially acted as a commercial landlord to his own company, thus engaging in an unincorporated trade or business under common control with the withdrawing employer within the meaning of § 1301(b)(1). The term "trade or business" in § 1301(b)(1) is not defined, but this circuit uses the test developed by the Supreme Court in *Commissioner of Internal Revenue v. Groetzinger,* 480 U.S. 23, 35 (1987), for applying a similar phrase in the tax code. *See Messina Prods.*, 706 F.3d at 878; *Fulkerson*, 238 F.3d at 895. The *Groetzinger* test examines whether the activity in question is undertaken (1) for the primary purpose of income or profit; and (2) with continuity and regularity. 480 U.S. at 35; *see also Messina Prods.*, 706 F.3d at 878; *Fulkerson*, 238 F.3d at 895. We have explained that "[o]ne purpose of the *Groetzinger* test is to distinguish trades or business from investments, which are not trades or business and thus cannot form a basis for imputing withdrawal liability under § 1301(b)(1)." *Fulkerson*, 238 F.3d at 895.

The district court, applying *Groetzinger*, concluded that Nagy's leasing activity was primarily for passive investment purposes. This conclusion was heavily influenced by our decision in *Fulkerson*. As we have recently explained, however, *Fulkerson* does not apply where, as here, the property is leased to the withdrawing employer itself. *See Messina Prods.*, 706 F.3d at 882. In that situation, the bright-line rule of *SCOFBP* and *Central*

*States, Southeast & Southwest Areas Pension Fund v. Ditello,*
974 F.2d 887, 890 (7th Cir. 1992), applies. *See Messina
Prods.,* 706 F.3d at 881-83. We held in *Ditello* that the
leasing of property to a withdrawing company under
the common control of the property owner constitutes
a "trade or business" within the meaning of § 1301(b)(1).
974 F.2d at 890; *see also Personnel, Inc.,* 974 F.2d at 793-
94; *Cent. States, Se. & Sw. Areas Pension Fund v. Koder,*
969 F.2d 451, 453 (7th Cir. 1992); *Slotky,* 956 F.2d at 1374.

The district court thought that the rule set forth in
*Ditello* had been vitiated by subsequent decisions under-
taking a more fact-specific analysis under *Groetzinger.*
The court specifically focused on *Fulkerson,* and to a
lesser degree on *Central States, Southeast & Southwest
Areas Pension Fund v. Neiman,* 285 F.3d 587, 595 (7th Cir.
2002), and *Central States, Southeast & Southwest Areas
Pension Fund v. White,* 258 F.3d 636, 642-43 (7th Cir.
2001), all of which had been decided differently—more
particularly, not in accordance with the *Ditello* rule.
The court did not have the benefit of *SCOFBP,* however,
which reiterated the principle established in *Ditello*
and explained that "leasing property to a withdrawing
employer itself is *categorically* a 'trade or business.'" 668
F.3d at 879 (emphasis added). Our recent decision in
*Messina Products* elaborates this principle and explains
that categorical treatment of leasing activity between
the owner and the withdrawing employer is consistent
with the *Groetzinger* test and serves the purpose of
§ 1301(b)(1):

> [W]here the real estate is rented to or used by the
> withdrawing employer and there is common owner-

ship, it is improbable that the rental activity could be deemed a truly passive investment. In such situations, the likelihood that a true purpose of the "lease" is to split up the withdrawing employer's assets is self-evident.

*Messina Prods.*, 706 F.3d at 882.

*Fulkerson*, *Nieman*, and *White* are not irreconcilable with *Ditello, SCOFBP,* and *Messina Products.* In *Nieman* the defendant earned income for management services rendered to a real-estate company; the real-estate company had not leased property to the withdrawing employer. 285 F.3d at 595. *Fulkerson* and *White* both dealt with real-estate holdings that were related to the withdrawing employer only by common ownership. *Fulkerson,* 238 F.3d at 893; *White,* 258 F.3d at 642-43. Distinguishing *Fulkerson* and *White* in *Messina Products,* we explained that "neither the Fulkersons nor the Whites rented property to the withdrawing employer itself." 706 F.3d at 882.

There were other issues in *Messina Products*, but on this point the case is materially indistinguishable from this one. In *Messina Products* the Central States Fund sought to impose personal liability on the owners of a withdrawing company based in part on the fact that they owned the property on which their company operated and leased it to the company. That situation, we said, was controlled by the "categorical" rule of *SCOFBP* and *Ditello. Id.* at 881-83. The same is true here. Nagy holds and leases to Ready Mix the commercial property on which Ready Mix conducts its operations. This categori-

cally constitutes a trade or business under common control with the withdrawing employer, which triggers personal liability under § 1301(b)(1).

### B. Independent-Contractor Status

Alternatively, if Nagy provided management services for Wells Venture as an independent contractor, then he is personally liable to the Fund as the sole proprietor of an unincorporated trade or business. If, however, he was an employee of Wells Venture, then his work does not supply a basis for personal liability under § 1301(b)(1).

Distinguishing between an employee and an independent contractor depends on an analysis of the following factors: (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the kind of occupation and the nature of the skills required, including whether skills are obtained in the workplace; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) the method and form of payment and benefits; and (5) the length of job commitment and/or expectations. *Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 963 (7th Cir. 2001); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992). The district court weighed these factors and concluded that Nagy was an independent contractor.

We see no clear error in this determination. As president of Wells Venture, Nagy was responsible to its

board of directors, of which he was also a member. No one supervised Nagy's work on a day-to-day basis. In his management of Wells Venture's affairs, Nagy had total freedom, subject only to occasional decisions by the board. We agree with the district court that the "control and supervision" exercised by the board was minimal, suggesting Nagy's independent-contractor status.

The "skills" factor in the analysis is inconclusive, as the district court held. Nagy provided management services, which can indicate either employee or independent-contractor status. There is no evidence that Wells Venture gave Nagy any specialized training. Rather, he performed general management tasks, like accounting and processing paperwork. The "expenses" factor is likewise inconclusive. In a typical employer-employee relationship, the employer pays for overhead and other operational expenses, while independent contractors usually bear their own costs. *EEOC v. N. Knox Sch. Corp.*, 154 F.3d 744, 749 (7th Cir. 1998). After the golf course was sold, Wells Venture's business address shifted to Nagy's home. He did not take a tax deduction for a home office, but he did take small deductions for office expenses related to his work for Wells Venture. But his management duties did not imply a significant cost, so this factor is at best neutral, as the district court held.

Most important to the district court's conclusion was the method and form by which Nagy was paid. He did not receive a salary through a payroll system, as

one would expect of an employee. Rather, Wells Venture paid Nagy an hourly rate and did not withhold taxes or provide fringe benefits. Presumably at his request, Wells Venture accounted for Nagy's compensation on the 1099-MISC form, which is used to report "miscellaneous income," often for independent contractors. *See* Forms and Associated Taxes for Independent Contractors, Internal Revenue Service (Page Last Reviewed or Updated Jan. 14, 2013), http://www.irs.gov/businesses/small/article/0,,id=179114,00.html. On his personal tax returns, Nagy reported his Wells Venture income on Schedule C, which covers "Profit or Loss from Business (Sole Proprietorship)." *See* Sole Proprietorships, Internal Revenue Service (Page Last Reviewed or Updated Apr. 5, 2013), http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Sole-Proprietorships. We have held in previous cases that the 1099 tax treatment weighs heavily in favor of independent-contractor status. *See* *N. Knox*, 154 F.3d at 750; *Neiman*, 285 F.3d at 595. It does here as well.

Nagy's other activities confirm that he provided services to Wells Venture as an independent contractor. Nagy had at least three other going concerns during the relevant time period: Nagy Ready Mix, Nagy Trucking, and Nagy Concrete. The record suggests he was a sales agent for another enterprise for some time as well, though the company flopped. Certainly a person can be a part-time employee for more than one enterprise. But on this record it looks more like Nagy was compensated by Wells Venture for purposes of a short-term project: handling the golf-course deal and

winding down the club's operations by selling off its assets and closing its accounts. This project took longer than expected because the golf-course purchaser defaulted. But the signs of an employer-employee relationship are missing. Nagy provided management services independently and for a limited, short-term purpose, and he was paid as an independent contractor. All this leads us to agree with the district court that Nagy was an independent contractor for Wells Venture and thus was engaged in an unincorporated trade or business. This is an independent basis for personal liability under § 1301(b)(1).

### III. Conclusion

Nagy owned and leased property to Ready Mix, a withdrawing employer over which he had common control. He also provided management services to Wells Venture as an independent contractor. Both activities qualify as an unincorporated trade or business under § 1301(b)(1). The district court therefore correctly found Nagy personally liable for Ready Mix's withdrawal liability, along with Nagy Trucking and Nagy Concrete. Summary judgment for the Fund was proper.

AFFIRMED.