In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-2781 & 11-3437

BRIAN FRENCH, DAVID FRENCH, JEANNA FRENCH,
and PAULA FRENCH VAN AKKEREN,

*Plaintiffs-Appellants*,

*v.*

WACHOVIA BANK, N.A.,

*Defendant-Appellee*.

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 06-C-869—**Rudolph T. Randa**, *Judge*.

ARGUED JUNE 6, 2012—DECIDED JULY 17, 2013

Before EASTERBROOK, *Chief Judge*, and WOOD and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. This case raises questions about the duties of loyalty and prudence in the law of trusts. Jim French founded a successful manufacturing firm in 1968 and later sold it for a handsome sum. As part of his estate plan, French executed two interlocking irrevocable trusts to benefit his four children upon his

death. In 2004 he decided that his trust company was not meeting his investment goals and moved the accounts to Wachovia Bank, N.A.

Among the underperforming investments in the trust portfolio were two whole life insurance policies. After months of evaluation and consultation with French and his lawyers, Wachovia replaced the old policies with new ones providing the same death benefit for significantly lower premiums. This transaction yielded a hefty but industry-standard commission for Wachovia's insurance-brokerage affiliate. The trust beneficiaries—French's adult children—were taken aback by the size of the commission and sued Wachovia for breach of fiduciary duty.

Their primary claim alleges self-dealing. The Frenches contend that Wachovia breached its duty of loyalty by reinvesting trust assets through its insurance affiliate, resulting in a large commission. On cross-motions for summary judgment, the district court rejected this claim, relying on an express conflict-of-interest waiver in the trust document. The court also held that the transaction was neither imprudent nor undertaken in bad faith. The court entered summary judgment for Wachovia and ordered the Frenches personally to pay the bank's costs and attorney's fees.

We affirm. Under the terms of the trust instrument, Wachovia had broad discretion to invest trust property without regard to conflicts of interest, risk, lack of diversification, or unproductivity. This language overrides the common-law prohibition against self-dealing and

displaces the prudent-investor rule. The duty to administer the trust in good faith always remains, but there is no evidence that the bank acted in bad faith. Finally, because Wachovia acted in good faith, the award of attorney's fees is proper under Wisconsin trust law.

## I. Background

In 1968 French founded the J.L. French Company, a manufacturing firm located in Sheboygan, Wisconsin. The company made component parts for small engines and was very successful. In 1996 French sold the business for approximately $200 million. He and his late wife's estate owned most of the stock, and his four children—Brian, David, Jeanna, and Paula (Van Akkeren)—held the rest, so the sale made the French family very wealthy.[1]

Kathy Gray, an attorney and partner at the Milwaukee law firm of Quarles & Brady, LLP, advised the French family on estate-planning matters. In 1991 French consulted her about establishing a trust to benefit his children upon his death. Pursuant to his instructions, Gray prepared and French executed a set of trust documents creating two interlocking irrevocable trusts structured as follows: (1) The assets in Trust #1 distribute in equal

---

[1] More specifically, the sale netted Jim French more than $100 million, individually and through his late wife's estate, and each of the French children realized more than $17 million.

shares to French's children upon his death but the trust pays no distributions during his lifetime; and (2) Trust #2 pays income to Trust #1 on an annual basis and will distribute its assets to Trust #1 on French's death.

As of 2004, when our story begins, Trust #2 held mostly stocks and bonds and was valued at approximately $24 million; Trust #1 was valued at more than $5 million, not counting the death-benefit value of the two life-insurance policies at the heart of this dispute. Only Trust #1 is relevant here, so from now on we will refer to a single trust even though there are two.

French initially placed the trust in the care of a Sheboygan attorney but over time lost confidence in the attorney's stewardship and moved the trust to First Bank. He later moved the trust again, this time to the Northern Trust Company. By 2004 French had grown dissatisfied with Northern Trust's conservative investment philosophy and modest rate of return. Of particular concern were two life-insurance policies in the trust's portfolio. The policies—one issued by Pacific Life and the other by Prudential Life—had a death benefit of $5 million each. To maintain that benefit, however, the trust had to pay increasingly steep premiums. In 2004 the annual premium for the Pacific Life policy was $164,000, and the premium for the Prudential policy was scheduled to jump by more than $40,000.

So French began to look for a new trustee with a better investment strategy. His daughter Paula urged him to talk to her stockbroker at Wachovia Securities about moving the trust to Wachovia Bank. In early 2004 French

held an initial meeting with Fred Church, a Wachovia vice president, at French's vacation home in Naples, Florida. Gray, the French family's attorney, was also present. At French's request Church and his associate, Steve Schumacher of Wachovia Insurance Services, commenced an evaluation of the trust portfolio to identify potential areas for improved profitability. In late May Gray sent Wachovia information about the two insurance policies held by the trust. On July 22 Church wrote to Gray confirming Wachovia's willingness to take over as trustee and identifying options to improve the trust's insurance assets. On August 3 Gray and her partner John Bannen, an insurance specialist at Quarles & Brady, met with Church in Milwaukee to discuss the range of options. Because of a communication snafu, however, French did not have adequate notice and could not attend the meeting. He was upset and remained so even after Bannen summarized the meeting in a detailed memorandum.

In September French instructed Gray to discontinue the insurance analysis, so for a time Bannen and Church did nothing further. In mid-October Church received word from Gray that French wanted to retain Wachovia as trustee after all. After some delay on Northern Trust's end, Wachovia took over as trustee effective December 29, 2004.

This revived the earlier discussion about life-insurance options. French directed Church to find a better deal and provided the necessary personal and medical information for Wachovia to shop around for quotes.

Working with Bannen, Church and Schumacher identified several possibilities, which Bannen summarized in a memo to French dated March 31, 2005. One proposal was to switch to new no-lapse life-insurance policies issued by John Hancock Life; these policies guaranteed the same death benefit but at a much lower premium. In the memo Bannen highlighted the pros and cons of the proposed swap. Most importantly, the trust would get the same insurance for far less money. The lower, fixed premiums for the two John Hancock policies—estimated savings: $620,000—would purchase the same $5 million per policy death benefit as the Pacific Life and Prudential policies. The no-lapse guarantee ensured that the contracts would pay the promised death benefit as long as the premiums were paid.

On the other hand, the trust would lose the flexibility of the Pacific Life and Prudential policies, which accumulated cash value that could be recouped if the policies were surrendered before French's death. But Bannen and Church could not foresee any scenario under which early surrender would be necessary or desirable. The trust had significant assets and was well diversified, made no distributions during French's lifetime, and the beneficiaries were already very wealthy. Church deemed the loss of flexibility unimportant to the overall goals of the trust. The main point of having life insurance in the investment mix was to reap the death benefit, not the cash surrender value, which would never exceed the death benefit in any event.

Church and Schumacher met with French on March 31 to discuss these options; Bannen participated by phone.

When the meeting ended, Schumacher gave French two blank John Hancock policy applications to take with him. The following week French signed the applications in blank and returned them to Wachovia Insurance, and Schumacher's assistant filled in the necessary information. On April 12 the managing director of Wachovia's Trust Department signed the applications and also executed the required IRS forms documenting the exchange. Schumacher submitted the applications to John Hancock but held back on authorizing the surrender of the Pacific Life and Prudential policies pending final approval from French. The new John Hancock policies issued at the end of the month.

In the meantime, Church sent Gray a proposed conflicts waiver identifying Wachovia Insurance Services, an affiliate of Wachovia Bank, as the broker for the insurance exchange, and also disclosing that Wachovia Insurance would receive a commission on the transaction. This prompted a new round of discussions between Gray and Church about the possibility of rebating the commission, or alternatively, commensurate fee concessions by the trustee. Neither was legally permissible. French balked at the terms of the conflicts waiver, which included a broad release of "any claim" arising out of Wachovia's purchase of new insurance on behalf of the trust. He refused to sign.

But as trustee Wachovia did not need French's authorization to proceed with the exchange, and the bank ultimately concluded that it did not need the conflicts waiver either. After consulting legal counsel and re-

viewing the terms of the trust instrument, Church notified Gray that Wachovia was withdrawing its request that French sign the conflicts waiver. On May 18 the transaction proceeded as planned. On behalf of the trust, Wachovia surrendered the Pacific Life and Prudential policies. Wachovia Insurance received a commission of $512,000 from the redeemed cash value of the policies, plus 2% of the annual premiums for the new policies for the next ten years. No one disputes that this commission, though sizable, is consistent with industry standards.

Over the summer of 2005, French and his children, through counsel, complained to Wachovia about the process surrounding the insurance exchange. In the fall the family retained a different Milwaukee law firm, and on November 4 the new lawyers asked Wachovia to reverse the transaction. By then it was too late to unwind the swap. After another change of counsel, the French children as trust beneficiaries sued Wachovia in Sheboygan County Circuit Court for breach of fiduciary duty. Wachovia removed the suit to federal court based on diversity of citizenship. *See* 28 U.S.C. § 1332. An initial skirmish over arbitration precipitated an unsuccessful interlocutory appeal by Wachovia. *See French v. Wachovia Bank, N.A.*, 574 F.3d 830 (7th Cir. 2009).

Once the case was back in the district court, discovery proceeded and both sides eventually moved for summary judgment. Wachovia sought judgment in its favor on all claims, and the beneficiaries asked for partial summary judgment on the limited issue of dis-

gorgement of the $512,000 commission. *See French v. Wachovia Bank, N.A.,* 800 F. Supp. 2d 975, 978 (E.D. Wis. 2011). In a comprehensive decision and order, the district court granted Wachovia's motion, applying Wisconsin law[2] and finding no support for the beneficiaries' claim that the bank breached its fiduciary duties of loyalty and prudence by engaging in self-dealing and making an imprudent investment. *See id.* at 986-91. Wachovia then requested and received an award of attorney's fees and costs, payable by the beneficiaries individually. This appeal followed.

## II. Discussion

The Frenches reprise their arguments that Wachovia violated its fiduciary duty by engaging in self-dealing and imprudently investing trust assets. Because the case was resolved on summary judgment, we would ordinarily review the district court's ruling de novo, construing all facts and drawing reasonable inferences in the light most favorable to the nonmoving party, here the Frenches. *Righi v. SMC Corp.,* 632 F.3d 404, 408 (7th Cir. 2011). But Wachovia urges us to apply the clear-error standard of review because the claims are equitable

---

[2] The trust instrument provides that Wisconsin law applies. *See* James L. French Irrevocable Trust of 1991 #1, Article VI, App. of Pls.-Appellants 43 ("[T]he rights and duties of the trustees and beneficiaries shall be construed and regulated and their validity and effect shall be determined by the laws of the State of Wisconsin.").

in nature and the beneficiaries are not entitled to a jury trial.[3]

The bank relies on a line of authority arising under the Employee Retirement Income Security Act ("ERISA"), which (among other things) creates claims for various forms of equitable relief not triable to a jury; we have held that when the district court resolves an ERISA claim on summary judgment and "'the only issue before the . . . court is the characterization of undisputed subsidiary facts,'" the clear-error standard of review applies. *Cent. States, Se. & Sw. Areas Pension Fund v. Nagy*, 714 F.3d 545, 549 (7th Cir. 2013) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d

---

[3] In an underdeveloped argument, the Frenches maintain that they are entitled to a jury trial. Because breach-of-trust claims are equitable in nature, they are ordinarily resolved by the court without a jury. *See Jefferson Nat'l Bank v. Cent. Nat'l Bank*, 700 F.2d 1143, 1149 (7th Cir. 1983); RESTATEMENT (SECOND) OF TRUSTS §§ 197, 198 (1959). In *Jefferson National Bank*, we noted a difference between "a suit in equity to compel the trustee to redress a breach of trust by placing a certain amount of money back into the trust corpus" and "a suit for immediate payment on an indebtedness arising out of a breach of trust," which may be brought at law. *Jefferson Nat'l Bank*, 700 F.2d at 1149. This case does not fit within the limited exception discussed in *Jefferson National Bank*. The Frenches contend that Wachovia breached its fiduciary duty in the administration of trust assets and seek to have the alleged loss of trust value restored. The case does not involve "a suit for immediate payment on an indebtedness" to the trust. *Id.*

874, 879 (7th Cir. 2013)); *see also McDougall v. Pioneer Ranch Ltd. P'ship*, 494 F.3d 571, 575-76 (7th Cir. 2007); *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 894 (7th Cir. 2001). In other words, where there is no right to a jury trial and the subsidiary facts are undisputed, a district court's order granting summary judgment presents a mixed question of law and fact and is reviewed for clear error. *Nagy*, 714 F.3d at 549 (citing *Fulkerson*, 238 F.3d at 894).

This approach to the standard of review in ERISA cases was first announced in *Central States, Southeast & Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1374 (7th Cir. 1992), and has been generally applied in ERISA cases ever since. *See Nagy*, 714 F.3d at 549 (collecting cases). Nothing in the logic of the rule limits it to that context, however. To the contrary, the analogy makes sense here because ERISA builds on the law of trusts. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989); *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 986 n.4 (7th Cir. 2013) ("Trust law serves as the basis for much of ERISA."). Still, because it "alters normal summary-judgment review," the modified standard of review "has sometimes been resisted." *Nagy*, 714 F.3d at 549 n.1. On occasion we are asked to overrule *Slotky*, but to date we have declined to revisit it. *See id*. (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Neiman*, 285 F.3d 587, 593 (7th Cir. 2002); *Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 640 (7th Cir. 2001); *Fulkerson*, 238 F.3d at 894)). We don't need to wade into the debate here because "[w]e would affirm under

either standard." *Freda v. Comm'r*, 656 F.3d 570, 573 (7th Cir. 2011) (quotation marks omitted).

### A.  Breach of Fiduciary Duty

The Frenches first argue that Wachovia breached its fiduciary duty of loyalty by engaging in prohibited self-dealing. Alternatively, they claim that the insurance transaction violated the prudent-investor rule as codified in Wisconsin via the Uniform Prudent Investor Act. *See* WIS. STAT. § 881.01. Finally, if the prudent-investor rule does not apply, the Frenches contend that Wachovia made the insurance swap in bad faith.

"'It is a fundamental principle of the law of trusts that the trustee is under a duty of undivided loyalty to the beneficiaries of the trust.'" *Hammes v. First Nat'l Bank & Trust Co. of Racine*, 255 N.W.2d 555, 561 (Wis. 1977) (quoting *Dick & Reuteman Co. v. Doherty Realty Co.*, 114 N.W.2d 475, 478 (Wis. 1962)); *see also Estate of Van Epps v. City Bank of Portage,* 161 N.W.2d 278, 282 (Wis. 1968); *see generally* RESTATEMENT (THIRD) OF TRUSTS § 78 (2007). The duty of loyalty requires the fiduciary "'to act solely for the benefit of the principal in all matters connected with the agency, even at the expense of the agent's own interests.'" *Zastrow v. Journal Commc's, Inc.*, 718 N.W.2d 51, 60 (Wis. 2006) (quoting *Losee v. Marine Bank*, 703 N.W.2d 751, 755 (Wis. Ct. App. 2005)); *see also Praefke v. Am. Enter. Life Ins. Co.*, 655 N.W.2d 456, 458-59 (Wis. Ct. App. 2002).

One aspect of the duty of loyalty is the strict prohibition against self-dealing. *See Praefke*, 655 N.W.2d at 459; *In re*

*Estate of Ames*, 448 N.W.2d 250, 252-53 (Wis. Ct. App. 1989); RESTATEMENT (THIRD) OF TRUSTS § 78(2). This prohibition applies whether or not the self-dealing results in profits drawn from the trust itself or paid by a third party. *See* RESTATEMENT (THIRD) OF TRUSTS § 78 cmt. d(1) ("A trustee engages in self-dealing and therefore normally violates the duty of loyalty by personally accepting from a third person any fee, commission, or other compensation for an act done by the trustee in connection with the administration of the trust.").

But the trust instrument may waive the general rule and authorize the trustee to engage in transactions that involve self-dealing. *Welch v. Welch*, 290 N.W. 758, 782 (Wis. 1940); RESTATEMENT (THIRD) OF TRUSTS § 78 cmt. c(2). General language granting broad powers to the trustee is not sufficient to waive the prohibition; to be effective, the authorization to self-deal must be express and clear. *See Alexopoulos v. Dakouras*, 179 N.W.2d 836, 840 (Wis. 1970); *Praefke*, 655 N.W.2d at 459.

Here, the trust instrument contains an express conflicts waiver in the section of the document that describes the trustee's powers and duties. In pertinent part, that section provides:

III. TRUSTEE

(B) Powers and Duties

(1) Without limiting powers incidental to the purposes of the trust or otherwise existing by law, the trustee and all successors shall have, without approval of any court, the power:

> to retain, invest and reinvest in any property without regard to whether the same may be authorized by law, regardless of any risk, lack of diversification or unproductivity involved; . . . *to continue as trustee and to deal with any trust hereunder without regard to conflicts of interest*; . . . and in general, without limitation by reason of the foregoing, to do any and every act and thing that the trustee would have the right to do as trustee under applicable common and statutory law or as the absolute owner of property provided that all powers shall be exercised exclusively in a fiduciary capacity.

James L. French Irrevocable Trust of 1991 #1, Article III(B)(1), App. of Pls.-Appellants 40-41 (emphasis added).

The italicized language is quite clear. As the district court aptly put it, the clause "specifically allows the trustee to deal 'without regard to conflicts of interest.' It is hard to imagine how the authorization to self-deal could be described more clearly." *French*, 800 F. Supp. 2d at 987. In an effort to escape this clarity, the Frenches focus on the phrase "to continue as trustee and to deal with *any trust hereunder*"; they claim that this language restricts application of the conflicts waiver to *newly created* trusts that come into being under the general authority granted in the trust instrument. This strikes us as a strained reading of the language. Read more naturally, the clause "any trust hereunder" authorizes the trustee to deal with *both* the current trust *and* any

others later created "without regard to conflicts of interest." Stated more succinctly, "any trust hereunder" naturally includes Trust #1 itself.

The Frenches also point out that "self-dealing" and "conflict of interest" are not synonymous terms. True, but that doesn't help their argument. Self-dealing is one type of a conflict of interest. *See* RESTATEMENT (THIRD) OF TRUSTS § 78 cmts. (d) & (e). The trust's use of the general term "conflicts of interest" necessarily includes the more specific kind of conflict of interest that consists of "self-dealing." In other words, the trust language broadly waives all conflicts of interest, including transactions involving self-dealing.

Finally, the Frenches rely on the provision in the trust instrument instructing the trustee to administer the trust in an "exclusively fiduciary capacity." This provision simply states the obvious—the trustee is a fiduciary. It does not withdraw or defeat the conflicts waiver found earlier in the document, which is both clear and specific. In short, the trust instrument expressly authorized Wachovia to proceed with the insurance transaction even though its insurance affiliate would earn a commission.

The Frenches next argue that the transaction was such a bad investment that it amounted to a violation of the bank's duty of prudence. *See generally* RESTATEMENT (THIRD) OF TRUSTS § 77 (2007) (explaining a trustee's fiduciary duty of prudence). In Wisconsin, as in many states, the common-law prudent-investor rule is codified under the Uniform Prudent Investor Act. *See* WIS. STAT.

§ 881.01; *see also* RESTATEMENT (THIRD) OF TRUSTS § 91 cmts. (b), (c) & (d) (2007) (discussing the widespread codification of the common-law prudent-investor rule via the Uniform Prudent Investor Act).

The Act provides that a "fiduciary shall invest and manage assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the estate, trust, conservatorship, or guardianship. In satisfying this standard, the fiduciary shall exercise reasonable care, skill, and caution." WIS. STAT. § 881.01(3)(a). The Act goes on to list a variety of factors that a fiduciary "shall consider" in making investment decisions, including "[g]eneral economic conditions," the "possible effect of inflation or deflation," the "expected tax consequences of investment decisions," the "expected total return from income and . . . appreciation," "liquidity" needs, "regularity of income," and the "[o]ther resources of the beneficiaries," among other factors. *Id.* § 881.01(3)(c).

The district court assumed that the statute applied and concluded that Wachovia had not violated it. The Frenches attack this holding on appeal, and Wachovia, needless to say, defends it. But the bank also raises an important threshold question, one that the district court chose not to address: Does the language of the trust instrument override the prudent-investor rule? The answer determines the applicable legal standard because by its terms the Act establishes only a "default rule" that "may be expanded, restricted, eliminated, or otherwise altered by the provisions of a will, trust, or court order."

*Id.* § 881.01(2)(b); *see also* RESTATEMENT (THIRD) OF TRUSTS § 91 cmts. (b) & (d).

The section of the trust instrument that we block-quoted earlier contains just such a contractual work-around: "[T]he trustee . . . shall have . . . the power . . . to retain, invest and reinvest in any property *without regard to whether the same may be authorized by law, regardless of any risk, lack of diversification or unproductivity involved . . . .*" French Trust, *supra*, Article III(B)(1), App. of Pls.-Appellants 40 (emphasis added). This language displaces the prudent-investor rule.

The trustee is always obligated to administer the trust in good faith, however. *See Estate of Koos v. Koos*, 69 N.W.2d 598, 605-06 (Wis. 1955); *Welch*, 290 N.W. at 782; *see generally* RESTATEMENT (THIRD) OF TRUSTS § 96 (2012) (explaining that exculpatory clauses in trust instruments do not remove liability for breaches of trust committed in bad faith). Because the prudent-investor rule does not apply, we review the trustee's action only for bad faith. This brings us to the Frenches' fallback bad-faith argument, and here again we agree with the district court; there is no evidence of bad faith. Indeed, all the evidence points in the opposite direction: The insurance exchange was undertaken in good faith, *and* indeed Wachovia satisfied the higher standard of the Uniform Prudent Investor Act, as the district court held. *See French*, 800 F. Supp. 2d at 989-91.

It is undisputed that the Pacific Life and Prudential policies were expensive. To maintain the $5 million death benefit, the annual premiums were very large and

increasing. When French moved the trust account from Northern Trust to Wachovia, he pressed the bank to save money and grow the trust corpus. Exchanging the Pacific Life and Prudential policies for the new, no-lapse policies issued by John Hancock maintained the same death benefit and saved $620,000 in premium costs. Although the old policies accumulated cash surrender value and the John Hancock policies did not, this loss of flexibility was insignificant because the insurance was held for its death benefit, not its cash value. In other words, the trust did not need life-insurance cash value as a tool; the trust was well diversified in other assets.

By all accounts the insurance exchange made very good business sense. The only possible reason to maintain insurance that accumulated cash-redemption value was to maintain greater flexibility. But absent some reason to think that the redemption option would be used (and none is offered), Wachovia's decision to reinvest in the new, less-expensive policies was eminently reasonable and was certainly made in good faith. That Wachovia's insurance affiliate earned a substantial commission does not amount to bad faith; the trust instrument permitted this kind of self-dealing, and the insurance exchange was a "win-win" for both the trust *and* the bank. *See* John H. Langbein, *Questioning the Trust Law Duty of Loyalty: Sole Interest or Best Interest?*, 114 YALE L.J. 929, 980-89 (2005) (discussing transactions that benefit both the trust and the trustee, especially in the era of professional financial-services administrators).

The Frenches insist that by initially seeking their father's consent and then going ahead with the exchange

unilaterally, Wachovia acted in bad faith. This argument is a nonstarter. Unless the trust instrument specifically requires it, a trustee does not need the consent of the settlor or the beneficiaries to make investment decisions about trust assets. *See* RESTATEMENT (THIRD) OF TRUSTS § 75 (2007); s*ee also id.* § 82(1)(c) cmt. d (2007). Here, the trust instrument gave Wachovia total discretion to "retain, invest and reinvest in any property."

The Frenches also argue that they were entitled to know the exact size of the commission before the transaction was consummated. It is true that a trustee has a duty to keep beneficiaries "reasonably informed of changes involving the trusteeship and about other significant developments concerning the trust and its administration, particularly material information needed by beneficiaries for the protection of their interests." RESTATEMENT (THIRD) OF TRUSTS § 82(1)(c); *see also Zastrow*, 718 N.W.2d at 60 (referring generally to a trustee's duty to disclose relevant information to beneficiaries). Because the importance of any given action of a trustee will vary by the terms, goals, and size of a trust, there are no hard and fast rules to determine when a development is sufficiently "significant" to trigger the duty to notify beneficiaries. Rather, the trustee is obligated to "exercise reasonable judgment in determining what matters have such significance." RESTATEMENT (THIRD) OF TRUSTS § 82(1)(c) cmt. (d). Generally speaking, only "important adjustments being considered in investment or other management strategies" need be disclosed. *Id.*

This single transaction was not so significant that the bank had a duty to provide detailed information about it in advance; the exchange of one insurance policy for another, while maintaining the identical death benefit, is not a significant adjustment in investment strategy. Regardless, Wachovia did, in fact, keep the Frenches in the loop from start to finish. Jim French specifically instructed Wachovia to look for other insurance options. The French family's lawyers at Quarles & Brady worked in tandem with Church and Schumacher over many months to evaluate the proposed exchange. Jim French signed the application forms and was kept informed every step of the way, and the Frenches had notice that Wachovia Insurance would earn a commission. Indeed, their lawyers negotiated before the fact for a rebate or a reduction in Wachovia's fees. The record does not support a finding of fiduciary breach based on Wachovia's failure to give the beneficiaries advance notice of the size of the commission.

## B. Attorney's Fees and Costs

The Frenches also challenge the district court's award of attorney's fees and costs. We "review the district court's award of attorney's fees for abuse of discretion and its legal analysis and methodology de novo." *Johnson v. GDF, Inc.*, 668 F.3d 927, 931 (7th Cir. 2012). Under Wisconsin law the trial court may shift a prevailing trustee's defense costs to the trust if the court finds that the trustee acted honestly and in good faith. *McGeoch Bldg. Co. v. Dick & Reuteman Co.*, 40 N.W.2d 577, 579 (Wis. 1950); *In re Estate of Cole*, 78 N.W. 402, 406 (Wis. 1899). Having

found no evidence of bad faith, the district court held that Wachovia was entitled to recover its attorney's fees and costs.

Usually the fees and costs are paid from the corpus of the trust, but here the district court ordered the Frenches personally to pay. There is no dispute that the court has the equitable power to do this. *See Cleveland v. Second Nat'l Bank & Trust Co.*, 149 F.2d 466, 469 (6th Cir. 1945); *duPont v. S. Nat'l Bank of Hous., Tex.*, 771 F.2d 874, 885 (5th Cir. 1985); *Brisacher v. Tracy-Collins Trust Co.*, 277 F.2d 519, 524 (10th Cir. 1960); *see also* Robert L. Rossi, 2 ATTORNEYS' FEES § 11:63 (3d ed. 2011) (collecting cases). The court held that the equities favored ordering the beneficiaries to pay the trustee's attorney's fees and costs. The successor trustee was not a party, and the court concluded that requiring Wachovia to pursue its fees award in a separate action against the new trustee would needlessly "multiply costs and delay the inevitable." The court also noted that the successor trustee had agreed to reimburse the Frenches for their own attorney's fees. Finally, the court observed that the Frenches "are of substantial means" and "can determine the proper allocation of the . . . fee award amongst themselves and the successor trustee."

This decision was entirely sensible. To attack it, the Frenches simply rehash their merits arguments about self-dealing and bad faith, which we have already rejected. We find no abuse of discretion.

AFFIRMED.